# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

-------------------------------------------------------------x
JOHN H. DUNBAR, JOYCE MILLS, NATALIE    :
PARKER, PAUL MENTON, PAUL DAUBEL,    :
ANTHONY HICKERSON, PAMELA    :
WINTERBURN, and CLAIRE RANSOM,    :
individually and on behalf of all others similarly    :
situated,    :    **CIVIL ACTION NO.:**
   :
         Plaintiffs,    :    District Judge:
       vs.    :    Magistrate Judge:
   :
NISSAN NORTH AMERICA, INC.,    :
   :    DEMAND FOR JURY TRIAL
         Defendant.    :
   :
-------------------------------------------------------------x

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs John H. Dunbar, Joyce Mills, Natalie Parker, Paul Menton, Paul Daubel, Anthony Hickerson, Pamela Winterburn, and Claire Ransom ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined class they seek to represent (the "Class"), bring this action against Defendant Nissan North America, Inc. ("Nissan"), based upon personal knowledge as to the factual allegations pertaining to themselves, and based upon information and belief and the investigation made by their undersigned attorneys as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action individually and on behalf of a class of similarly situated owners and lessees who purchased or leased white Nissans in all model years from 2015 to the present (collectively, the "Class Vehicles").[1]

---

[1] Plaintiffs exclude from the proposed Class consumers whose claims were released by the class action settlement involving 2013 Nissan Rogue and Infiniti QX56 vehicles with white paint that were covered by the class action settlement in *Nelson v. Nissan North America, Inc.*, Case No. 3:17-cv-01114 (Middle Dist. Tenn, Nashville Division). Plaintiffs reserve the right to amend their

2.     The Class Vehicles all suffer from a paint defect that causes the Class Vehicles' white paint to fail, peel, delaminate (that is, the paint layers separate due to adhesion issues), bubble, and flake (the "Paint Defect").

3.     The following pictures are examples showing the effects of the Paint Defect:



---

definition of Class Vehicles to include other Nissan-manufactured vehicles with a similar Paint Defect.





4.     The Paint Defect existed in latent form when Nissan manufactured the vehicles and when Plaintiffs purchased or leased the vehicles, but as demonstrated by innumerable consumer complaints, the Paint Defect will invariably manifest itself during the reasonably expected life of the Class Vehicles owned by Plaintiffs and the Class, causing paint failure, peeling, delamination, bubbling, and flaking.

4

5.     The Paint Defect stems from a defect in the paint itself; a defect in the paint when applied to the Class Vehicles' exterior; and/or a defect in Nissan's manufacturing process, including the complexities in the method of applying the white paint to give the Class Vehicles their pearlescent or metallic finish.

6.     As detailed below, at all relevant times (late 2014 to the present based on the time Nissan began selling 2015 Class Vehicle models), Nissan has been fully aware of the importance customers place on the paint and exterior appearance of vehicles. Automakers paint vehicles to enhance aesthetics (color, gloss, and appearance) and to provide necessary functionality (chemical and corrosion-resistance to protect the body of the vehicle). If any of these purposes in selecting material and painting the vehicle is compromised, then the value of the vehicle is greatly diminished and an integral component of the car will likely fail, causing further damage in the form of rust and/or corrosion.

7.     In 2017, two class actions were filed against Nissan alleging that the white paint was defective on white Nissan Rogues manufactured between January 11, 2013 and April 23, 2013 as well as on white Infiniti QX56s produced between November 20, 2009 and December 12, 2012. Those cases were: *Nelson v. Nissan North America, Inc.,* Case No. 3:17-cv-01114 (M.D. Tenn.), and *Anglin v. Nissan North America, Inc.,* Case No. 1:17-cv-04240 (N.D. Ill.) (collectively the "*Nelson* case").

8.     Those cases were brought as class actions alleging that Nissan knew about the paint defects but refused to honor warranties and replace the paint if the affected vehicle owners requested a repaint.

9.     In 2019, Nissan agreed to resolve the *Nelson* case by, among other things, extending the paint warranty on the limited set of vehicles in the *Nelson* settlement class and by agreeing to

5

provide a one-time full vehicle repaint (subject to a co-pay).

10. Pursuant to the *Nelson* settlement, the Repaint Claim Period and the Reimbursement Period commenced on January 10, 2020.

11. In connection with the *Nelson* settlement, Nissan provided notice only to people in the limited settlement class in *Nelson* and did not provide notice to Plaintiffs or to people outside the *Nelson* class, including the Class members here.

12. Nissan did not notify other owners of white Nissans or Infinitis about the Paint Defect.

13. Upon information and belief, following the *Nelson* settlement, Nissan received numerous consumer complaints reporting to Nissan that cars outside the *Nelson* settlement class were experiencing peeling white paint.

14. Nevertheless, Nissan refused to repair the defective paint on its other white vehicles and rejected attempts by Class members to repaint their vehicles.

15. At all relevant times, Nissan was aware of the Paint Defect based on internal testing, substantially similar paint problems with other Nissan vehicle models, and countless consumer complaints.

16. Nissan has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Paint Defect, which was material to Plaintiffs and Class members, who could not reasonably know of the Paint Defect. Under all circumstances, Nissan had a duty to disclose the latent Paint Defect at the point of sale of the Class Vehicles as well as when consumers complained to Nissan that the white paint on their vehicles was peeling.

17. Despite that knowledge and duty, Nissan has repeatedly failed to disclose, and even actively concealed, the Paint Defect from Class members and the public, and continued to market

the Class Vehicles as luxurious, stylish, high-quality, high-value, and value-retaining vehicles which, because of the Paint Defect, they are not.

18.     As detailed below, although it knew about the Paint Defect in its white vehicles, Nissan refused to repair them, refused to repaint them, and failed to provide an adequate remedy to the Class.

19.     Nissan has refused, and continues to refuse, to provide repairs or any other meaningful remedy to those who have suffered economic harm because of the Paint Defect.

20.     The Paint Defect thus decreases the value of the Class Vehicles, forcing owners/lessees of the Vehicles to either live with the problems caused by the Defect or spend significant money to have the Class Vehicles repainted. Even then, repainting an impacted panel does not cure the Paint Defect because the remaining parts of the Class Vehicle still suffer from the latent Paint Defect. Moreover, repainting the Class Vehicles results in a cosmetic defect that permanently decreases the Class Vehicle's value.

21.     As a direct and proximate result of Nissan's deceit regarding, and failure to disclose, the Paint Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the Paint Defect significantly diminishes the value of the Class Vehicles; (2) now own Class Vehicles that suffer premature unsightly paint failures;  (3) must expend significant money to have their Class Vehicles (inadequately) repaired and repainted; and (4) now own vehicles that are impaired and are worth less than they would be if they did not have the Paint Defect.

22.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Paint Defect at the point of sale. Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages because of Nissan's unlawful conduct.

7

23.     Plaintiffs, individually and on behalf of all others similarly situated, bring claims against Nissan for unjust enrichment and fraudulent concealment. Plaintiffs and Class members seek restitution, actual and/or compensatory damages, and equitable relief, among other forms of relief (as alleged herein).

## PARTIES

**A.     Plaintiffs**

24.     Plaintiff John H. Dunbar is a resident of Merritt Island, Florida and is a citizen of Florida. As set forth below, Mr. Dunbar purchased a 2018 Nissan Frontier in Glacier White with the Paint Defect.

25.     Plaintiffs Joyce Mills and Natalie Parker are residents of Mesa, Arizona and are citizens of Arizona. As set forth below, Ms. Mills and Ms. Parker bought a 2018 Nissan Frontier in Glacier White with the Paint Defect.

26.     Plaintiff Paul Menton is a resident of Falmouth, Massachusetts and is a citizen of Massachusetts. As set forth below, Mr. Menton purchased a 2018 Nissan Frontier in Glacier White with the Paint Defect.

27.     Plaintiff Paul Daubel is a resident of Fremont, Ohio and is a citizen of Ohio. As set forth below, Mr. Daubel purchased a 2017 Nissan Frontier in Glacier White with the Paint Defect.

28.     Plaintiff Anthony Hickerson is a resident of Brunson, South Carolina and is a citizen of South Carolina. As set forth below, Mr. Hickerson purchased a white 2019 Nissan Murano with the Paint Defect.

29.     Plaintiff Pamela Winterburn is a resident of Milledgeville, Georgia and is a citizen of Georgia. As set forth below, Ms. Winterburn purchased a white 2017 Nissan Frontier with the Paint Defect.

30.     Plaintiff Claire Ransom is a resident of Waterford Charter Township, Michigan and is a citizen of Michigan. As set forth below, Ms. Ransom purchased a white 2017 Nissan Frontier SV with the Paint Defect.

**B.     Defendant**

31.     Nissan is a Delaware corporation with its principal place of business in Franklin, Tennessee. Its address is One Nissan Way, Franklin, Tennessee 37067-6367. Before October 26, 2021, Nissan was incorporated in California with its headquarters in Franklin, Tennessee, but as of October 26, 2021, Nissan's state of incorporation was changed to Tennessee.

32.     Nissan is registered to do business in Tennessee.

33.     At all relevant times, Nissan has been responsible for designing, manufacturing, distributing, marketing, selling, and servicing Nissan vehicles in the United States, including the Class Vehicles.

34.     From its Tennessee headquarters, Nissan's management oversaw the design, manufacture, distribution, marketing, sales, and service of the Class Vehicles throughout the United States.

35.     Nissan's sales and marketing leadership, as well as its accounting, financial, and legal departments, are all based in its Tennessee headquarters. Furthermore, Nissan's marketing, sales, and financial documents were created in, and are located at, its Tennessee headquarters. Nissan created and/or authorized the false and misleading representations and omissions from Tennessee.

36.     Nissan's substantial participation in designing, manufacturing, distributing, marketing, and selling the Class Vehicles from its Tennessee headquarters means Tennessee has the greatest interest in the subject matter of this lawsuit.

## JURISDICTION AND VENUE

37. This is a class action.

38. This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Class and Nissan. Plaintiffs are citizens of Arizona, Florida, Massachusetts, Ohio, South Carolina, Georgia, and west Virginia. Nissan is a citizen of Tennessee. In addition, the amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class.

39. This Court has personal jurisdiction over Nissan. Nissan's principal place of business is in Tennessee, and/or Nissan is engaged in systematic and continuous business activity in Tennessee, has sufficient minimum contacts in Tennessee, or otherwise intentionally avails itself of the Tennessee consumer market.

40. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Nissan's principal place of business is in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including oversight of designing, manufacturing, distributing, marketing, selling, and servicing the Class Vehicles.

## FACTUAL BACKGROUND

**The Class Vehicles; Nissan's Representations Regarding the Class Vehicles; Class Vehicles Sales; and Nissan Drivers' Tendency to Retain the Class Vehicles**

41. Throughout the years, and at all relevant times, Nissan consistently and widely marketed the Class Vehicles as value-retaining, stylish, reliable, and durable vehicles. Nissan's marketing of the Class Vehicles has enabled it to charge consumers premium prices for the Class Vehicles.

42. Nissan directly markets the Class Vehicles to consumers via extensive nationwide,

multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

43.     Nissan advertised the Class Vehicles' exterior paint as a central and integral attribute of the Class Vehicles, an attribute that was necessary to complement the Class Vehicles' value, ability to retain value, style, luxury, and durability.

44.     The Class Vehicle models are some of the highest-selling vehicles in the United States market during the relevant time because of Nissan's marketing of the Class Vehicles as value-retaining, stylish, luxurious, and durable vehicles.

45.     As an example, in the United States, Nissan sold approximately 1.4 million Nissans in 2018, including hundreds of thousands of white vehicles; Nissan sold approximately 1.3 million Nissans in 2019, more than 300,000 of which were white; Nissan sold approximately 899,000 Nissans in 2020, more than 300,000 of which were white; and in 2021 Nissan sold approximately 899,000 Nissans, more than 300,000 of which were white.

46.     During the proposed Class Period, white was the most popular Nissan vehicle color.

47.     The Class Vehicles have found sales success based on Nissan's marketing of the Class Vehicles as value-retaining, stylish, and durable vehicles.

48.     As a result of Nissan's marketing, Plaintiffs and Class members formed a reasonable belief and expectation that the paint used on the Class Vehicles was of high quality, would endure, and would positively impact the long-term value of the Class Vehicles. Furthermore, Plaintiffs and Class members paid a premium to purchase their Nissans in white paint, as vehicles painted white are generally more expensive when compared with vehicles in other colors. Vehicles painted white also are marketed as showing less dirt and blemishes than vehicles painted other colors.

11

49.     Likewise, based on the marketed durability and longevity of the Class Vehicles, Plaintiffs and Class members formed a reasonable belief and expectation that the Class Vehicles' paint would last a time commensurate with the useful life and longevity of their Class Vehicles. Recent data from S&P Global Mobility, which tracks state vehicle registration data nationwide, indicates that the average age of cars on the road in America is 12.5 years, with many cars being kept for 15 to 20 years. Moreover, cars in America typically are expected to last for 200,000 to 300,000 miles.

50.     Thus, Plaintiffs and Class members reasonably expected that the Class Vehicles' paint would remain intact for that same duration.

51.     Moreover, reasonable consumers like Plaintiffs and the Class members reasonably expected that the Class Vehicles' paint would not fail, peel, delaminate, flake, or bubble under normal conditions during the reasonably expected life of the Class Vehicles and/or cause other problems that would negatively impact the value of the Class Vehicles.

52.     Plaintiffs and Class members were exposed to and relied on Nissan's pervasive, long-term, national, multimedia marketing campaign touting the supposed value, style, luxury, and durability of the Class Vehicles, including the quality and durability of the exterior paint (and the exterior paint's ability to complement the aesthetics and style of the Class Vehicles). Plaintiffs and Class members justifiably made their decisions to purchase and/or lease their Class Vehicles based on Nissan's misleading marketing.

53.     However, as discussed below, rather than produce Class Vehicles with durable, high-quality paint lasting for the Class Vehicles' expected useful life, Nissan knowingly manufactured and sold the Class Vehicles with a Paint Defect that causes paint failure, peeling, delaminating, bubbling and flaking during the expected life of the Class Vehicles, greatly reducing

their value and consumer desirability, and also resulting in costly repairs.

**Nissan's Paint Process and the Paint Defect**

54.     The Class Vehicles all suffer from a Paint Defect which causes the white paint applied to the Class Vehicles to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

55.     The Paint Defect in the Class Vehicles is a systemic defect in the Class Vehicles' white paint; the white paint as applied to the Class Vehicles' exterior materials; and/or the manufacturing processes Nissan used to apply the Class Vehicles' white paint.

56.     The Paint Defect is not associated with geography or other environmental factors because the Paint Defect is found in Class Vehicles in every state, regardless of climate or other geographical factors (such as proximity to cities and pollution exposure). Moreover, the Paint Defect only impacts Class Vehicles (all painted white), as opposed to Nissan vehicles painted in other colors.

57.     During the relevant timeframe, the Class Vehicles were primarily manufactured in Nissan's automobile factories in Smyrna, Tennessee; Canton, Mississippi; and Aguascalientes, Mexico using a robotic paint system.

58.     The Paint Defect here stems from: (1) the white paint applied to Class Vehicles itself; (2) issues involved in applying multiple stages or coats of paint on a vast majority of the Class Vehicles; and/or (3) issues with the Class Vehicles' primer, e-coat, and clear coat paint layers.

59.     In most cars, there are only two primary paint layers, starting with the colored "base coat" or "ground coat" at the bottom, and then topped with a "clear coat." With a three-stage paint process, however, there is an additional "mid coat" pearl or metallic paint layer between the base

coat and the clear coat.

60. Three-stage paints, like the process Nissan used, add a sparkling finish to a car's overall paintwork, giving the surface a sense of depth or richness that two layers alone would not be able to accomplish. Due to aesthetic benefits, three-stage painted cars are more appealing and costly to consumers, including the Class Vehicles purchased by Plaintiffs and Class Members.

61. However, three-stage paints like the paint colors underlying the Paint Defect are far more likely to peel or delaminate, as well-understood by car manufacturers (including Nissan) and as seen in the Class Vehicles. Key factors contributing to the early peeling of three-stage paints include:

     a.    Inconsistent Application: The process requires meticulous precision. Any variation in the application of the clear coat or insufficient curing can lead to adhesion problems, resulting in premature peeling; and

     b.    Complexity and Cost: The additional layers in three-stage paints increase both cost and application difficulty. Minor defects during production were more likely to result in long-term durability issues.

62. The three-stage pearl paints used on Class Vehicles were prone to peeling, delaminating and other issues due to a latent defect in the "three-stage" white paint itself, or in the manufacturing process (such as an inconsistent application of the paint) Nissan used to apply the white paint during the relevant time.

63. In addition, primer is an essential element in the quality of the adhesion between the coats. Primers must be tested for their ability to withstand "chemical reactivity" to UV light

14

and extreme weather conditions because disintegration of any agents within the primer will likely cause "a drastic loss of adhesion and delamination of the topcoat [clearcoat]."[2] The durability of the paint, and the prevention of corrosion, is dependent upon the adhesion of the layers of the paint system, including the e-coat, primer, and clear coat layers.

64.     Inter-coat adhesion of all paint layers is a critical determinant of the quality of a paint system on any item (including the ability to withstand UV light), not just automobiles. Achieving excellent performance and application properties of any paint requires a holistic approach to ensure compatibility, not only within a paint formulation across all ingredients, but also between the paint formulation and the paint system used for the application of the paint, so that all paint layers can properly work together and bring out those properties. An inadequate layer or poor adhesion between layers (*i.e.*, poor inter-coat adhesion) is the weakest link of a paint system, and greatly increases the probability of paint system failure, such as the peeling, delaminating, and other paint issues at issue in this case.

65.     Given the purpose of automotive coatings and the value added by a quality paint job, automobile companies spend millions of dollars conducting a myriad of long-term and short-term tests to ensure automotive paints provide excellent aesthetics and performance properties.

66.     Degradation of the coatings in an automotive paint system—as was highly likely in the case (in addition to issues related to the white paint's three-stage painting process)—can be caused by the defective nature of the materials and paint layers used or the improper manner in which they are applied during the painting process, resulting in accelerated degradation at the interface between the coats. This degradation causes a loss of adhesion and will manifest as

---

[2] Nelson K. Akafuah, et al., *Evolution of the Automotive Body Coating Process—A Review,* *MDPI* (June 13, 2016), p. 20, http://www.mdpi.com/2079-6412/6/2/24.

peeling or delaminating, and eventually rusting and damage to the vehicles. This is what happened and is happening to the Class Vehicles.

67. Reasonable consumers considering purchasing or leasing a Class Vehicle developed a reasonable and material expectation regarding the quality and longevity of the paint used on Class Vehicles based on Nissan's nationwide public advertisements, statements, and representations regarding the high-value and durability of its vehicles and paints.

68. Contrary to these reasonable and material expectations, and Nissan's advertisements, statements, and representations, however, the paint systems on the Class Vehicles have failed due to the Paint Defect–a clear loss of adhesion between the Vehicles' coats.

**The Paint Defect Is Widespread in the Class Vehicles, A Class Action was Filed and Settled Covering Some White Nissan Vehicles, and in 2019 and 2020, Nissan Acknowledged the Defect by Implementing An (Inadequate) Extended Warranty Program**

69. As demonstrated by the many complaints and reports made by owners and lessees of Class Vehicles, the Paint Defect is a ubiquitous and expensive problem for owners and lessees of Class Vehicles.

70. Class member reports relating to the Paint Defect bear striking similarities to one another and (as further detailed below) the Plaintiffs' experiences with the Paint Defect and Nissan's response to the Paint Defect, include:

      a.    Reports of premature paint failure, such as peeling, delaminating, bubbling, and flaking during the reasonably expected life of Class Vehicles;

      b.    Reports of Nissan, auto paint technicians, and auto body repair shops being well-aware of the Class Vehicles' Paint Defect;

      c.    Repair shops explaining that they have re-painted hundreds of white Nissans because of the Paint Defect;

      d.    Reports of the inadequate and arbitrary administration of Nissan's warranties and extended warranties directed

16

toward the Paint Defect;

e.    Reports of Nissan or its agents' improperly refusing to repair the Paint Defect; and

f.    Reports of high estimates and high costs to repair the Paint Defect, inadequate repairs, and risk of further paint failure (stemming, for instance, from the repainting of only one portion of the vehicle instead of repainting the entire vehicle).

71.    On Reddit, there is subreddit called "Nissan Peeling paint". https://www.reddit.com/r/nissanfrontier/comments/10uo1cs/nissan_peeling_paint/ (last accessed July 31, 2025) in which Nissan owners and lessees post information about the peeling paint on their vehicles.

72.    In 2022, a user Named "John" posted: "My name is John and I have a 2018 white frontier with the paint peeling off of the driver side fender, roof and other areas in large chunks. After the Nissan dealership warranty department performed a paint test and proved the paint was defective and pulled off more of my paint, Consumer affairs won't cover it. I've seen trucks everywhere in person and online with the same problem. …"

73.    That user also posted pictures of his peeling paint, including the following:



https://www.reddit.com/media?url=https%3A%2F%2Fpreview.redd.it%2Fnissan-peeling-paint-v0-hddt9lkmsfga1.jpg%3Fwidth%3D640%26crop%3Dsmart%26auto%3Dwebp%26s%3D6c21c2de43f98eededc6ea59e08e253710e73718 (last accessed July 31, 2025):





74.    That vehicle was painted in Glacier White.

75.    A Facebook group called "Nissan Frontier Peeling Paint Defect" contains numerous examples of white Nissans with peeling paint.

76.    For example, a group-member named "Stacy Mitchell Ingram" shared pictures of

her white 2017 Murano with peeling paint, including the following:







21

77.     A Facebook user named "Dan Janakes" posted:

> My 2017 Frontier has paint chipping on both front
> fenders in the same spot on both sides. I also have
> paint chipping in multiple spots on the door jams. It's
> obviously a defect. I've never had any car or truck do
> this. My auto body shop guy said it's a common
> problem with Nissan Frontiers. He thought there had
> been a recall but after checking, it looks like they are
> pretending this isn't any issue....
> https://www.facebook.com/groups/frontierpaintdefe
> ct/ (last accessed July 31, 2025).

78.     A user named Eleanor Dougherty posted pictures of her Nissan with peeling paint
and she said, "This is ridiculous and Nissan takes no responsibility [...] been flaking off since I
[bought] it in 2019."

79.     On Threads, there is a forum called "TitanXDfroum.com" that details peeling white
paint problems with Nissans. One example from April 30, 2023 by a user named "JFox" is entitled
"White Pearl Paint Flaking Off". The entry says,

> "[A]fter 4 and a half years my paint started to flake off. I found out the white paint is the
> worst color[,] and Nissan does not want to cover it under warrant. It took 8 months to get
> an approval. And now I see it starting to bubble on the front left fender and the Nissan
> dealer said they are done they will not handle paint issue [a]ny more."

https://www.titanxdforum.com/threads/white-pearl-paint-flaking-off.46256/ (last accessed July

31, 2025)

80.     That user posted pictures of the user's Nissan with peeling white paint.

22



81.     In response, other users shared similar experiences, including one named "Wandamiller" who posted,

> "My Nissan Murano's paint has had paint "bubbles" under the paint for years. It's 2016 white pearl. When I took it to body shop, they told me they had so many Nissans come through with that problem. He said it would have to be completely sanded and repainted because the undercoat was the problem. Paint would never stick. It was gonna cost $6,000. Needless to say, I still have 4-5 half dollar spots without paint. Very frustrated!"

82.     In 2017, a class action was filed against Nissan on behalf of consumers who purchased Nissans and Infiniti brand vehicles seeking relief for a defect in the vehicles' white paint. *Nelson v. Nissan North America, Inc.,* Case No. 3:17-cv-1114 (Middle Dist. Tenn., Nashville, Div.). A similar action was filed in Illinois. *Anglin v. Nissan North America, Inc.,* Case No. 17-cv-04240, (N.D. Ill.) (collectively, Plaintiffs refer here to the two cases as the "*Nelson* case").

83. The plaintiffs in the *Nelson* case complained that the white paint on Nissans and Infinitis (manufactured by Nissan) would peel as a result of a latent manufacturing defect.

84. In 2019, Nissan agreed to settle the *Nelson* case on a class-wide basis.

85. The Settlement created a nationwide class defined as: All persons in the United States and its territories including Puerto Rico who purchased any White-painted Nissan Rogue produced between January 11, 2013 and April 23, 2013, and/or any White-painted Infiniti QX56 produced between November 20, 2009 and December 12, 2012.

86. As part of the *Nelson* settlement, Nissan agreed to provide Settlement Class Members with an Extended Warranty for their vehicles, offering two primary benefits: (1) repaints of the Subject Vehicles, or monetary reimbursement if Class Members already obtained a repaint; and (2) payment, or reimbursement, for related rental car expenses during the repaint process. In addition to the Extended Warranty, Nissan also agreed to provide *Nelson* Settlement Class Members with eligibility for Nissan's Vehicle Purchase Program.

87. The settlement covered only a subset of Nissan vehicles during a very short time period.

88. On December 19, 2019, the District Court approved the *Nelson* Settlement.

89. On January 10, 2020, in accordance with that settlement, Nissan issued a "Quality Action", "Campaign Bulletin" titled "White Paint Delamination Warranty Extension Dealer Notification". The Campaign Bulletin notified Nissan dealers and its sales and service personnel about the settlement and about a notice that would be sent to owners of eligible vehicles about the settlement.

90. The Campaign Bulletin provided details to Nissan personnel about the warranty extension as a result of the *Nelson* settlement and that the paint warranty extension will allow for

24

a one-time full vehicle repaint (subject to customer copayment). It also provided others details about the *Nelson* settlement and about settlement benefits.

91. On the same day, January 10, 2020, Nissan issued a "Quality Action", "Campaign Bulletin" titled "White Paint Delamination Warranty Extension" governing certain 2011 through 2013 Infiniti QX56 vehicles. The Campaign Bulletin was similar to the one covering Nissans but it covered certain Infinitis.

92. The Infiniti Campaign Bulletin notified Infiniti retailers and its sales, parts, and service personnel about the *Nelson* settlement and about a notice that would be sent to owners of eligible vehicles about the settlement. The Campaign Bulletin provided details to Infiniti personnel about the warranty extension as a result of the settlement and that the paint warranty extension will allow for a one-time full vehicle repaint (subject to customer copayment). It also provided others details about the *Nelson* settlement and about settlement benefits.[3]

93. Since then, consumers have continued to complain to Nissan that their vehicles are experiencing the same defective paint problems, but these consumers are not covered by the extended warranty or by the *Nelson* class action settlement.

94. There are many forums and threads about the Paint Defect manifestation in Nissans, each of which contains sometimes dozens of postings describing similar experiences with the Paint Defect and Nissan's refusal to address the issue.

95. Reports of the Paint Defect in Nissans are also confirmed elsewhere on the internet, including on the National Highway Traffic Safety Administration website, CarComplaints.com[4];

---

[3] https://static.nhtsa.gov/odi/tsbs/2020/MC-10171238-0001.pdf (last accessed August 4, 2025).
[4] https://www.carcomplaints.com/Nissan/Rogue/2013/body_paint/paint_peeling_and_bubbling.shtml (last accessed August 4, 2025).

and Reddit.com[5], among other sources.

96.     Owners and lessees of Class Vehicles have made substantially similar widespread complaints of the Paint.

**Nissan Knew of the Paint Defect Before It Sold Class Vehicles to Plaintiffs**

97.     Nissan knew about the Paint Defect before it sold or leased Class Vehicles with the Paint Defect to Plaintiffs and Class Members, based on: (i) internal paint testing; (ii) prior complaints and reports to Nissan of peeling paint on white Nissans involving substantially similar paint defects; (iii) consumer reports about the Paint Defect; and (iv) the prior settled *Nelson* class action directly addressing a substantially similar paint issue as the Paint Defect at issue in this case.

98.     Despite its knowledge (as detailed below), Nissan did not disclose the Paint Defect to Plaintiffs and the Class, and instead, actively concealed it.

    i.      Internal *Testing*

99.     Prior to a new paint and/or paint system being used on a vehicle (such as the primer or clear coat system used by Nissan, for instance), automakers such as Nissan are known to employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the paint system is brought to market.

100.    Most of these test procedures are developed and standardized by the American

---

[5]  https://www.reddit.com/r/nissanfrontier/comments/10uo1cs/nissan_peeling_paint/ (last accessed August 4, 2025). See also https://www.reddit.com/r/FrontierPaintPeeling (last accessed August 4, 2025).

Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

a. accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

b. long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM standards) in various environments, such as Florida (high UV light, humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature), condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and chemical properties testing, including resistance to solvents, chemicals and various fluids the vehicle will likely encounter in the open

27

environment.

101.    Furthermore, Nissan is member of the Automotive Industry Action Group ("AIAG"), which has a common Production Part Approval Process ("PPAP"). According to prevailing automotive industry standards during the relevant period (late 2012 to the present), it was and is standard practice to undertake a PPAP when making changes to an existing automotive design, including a change in paint and the process of applying the paint to a vehicle.

102.    The Automotive Industry Action Group, of which Nissan is a member, has developed a common PPAP standard for suppliers of automotive paint. The PPAP is a standardized, required process in the automotive industry that helps manufacturers and suppliers communicate and approve production designs and processes before, during, and after manufacture.

103.    The PPAP is designed to demonstrate that a supplier has developed its design and production process to meet the client's requirements, minimizing the risk of failure by effective use of advanced planning.  Requests for approval must be supported in official PPAP format and with documented results when needed.

104.    The purpose of any PPAP is to: (a) ensure that a supplier can meet the manufacturability and quality requirements of the parts supplied to the customer; (b) provide evidence that the customer engineering design record and specifications are clearly understood and fulfilled by the supplier; and (c) demonstrate that the established manufacturing process has the potential to produce the part that consistently meets all requirements during the actual production run at the quoted production.

105.    Typically, there are numerous PPAP requirements, including requirements for material performance, which includes paint performance. On information and belief, Nissan would have required its suppliers to test the paint, and its application, to see how it performed in simulated

28

real-world conditions to determine the quality and durability of the paint, whether the paint adhered to the surface of the vehicle, whether it corroded or delaminated, how it performed when subjected to heat, cold, light, moisture, and rain, whether the color or gloss faded, changed, or was retained, among other performance metrics.

106. Thus, either as part of the PPAP or independent of it, Nissan performed several of the above-described ASTM and SAE test procedures. In fact, Nissan has developed what is referred to as "Nissan SAE Standards & Testing" that are used in connection with the testing of its vehicles, including NES M0007 (outlining the various testing methods for automotive paint on steel sheets), NES M7075 (covering various tests for materials, including paint, such as salt/spray/corrosion, weather resistance, and paint adhesion tests, as well as SAE J2334 (standards for corrosion test for automotive paint systems), and SAE J1885, J2412 and J2527 (standards for automotive materials, including paints), as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world conditions.

107. The development of the paint and the paint manufacturing process in this case, including the testing performed in connection therewith, would have revealed the Paint Defect. However, the details regarding the testing performed by Nissan and the results of that testing are in the exclusive custody and control of Nissan.

108. Moreover, prior to Class Vehicle distribution, Nissan would have conducted factory audits and quality control checks that would have identified irregularities in paint thickness, adherence, which would have made Nissan aware of a substantially heightened risk of future peeling.

109. Nissan also would have monitored customer complaints and dealership repair data concerning the Paint Defect.

       *ii.*     *Customer Complaints Directly to Nissan and Online Sources Nissan Monitored*

110.    Nissan also knew or should have known about the Paint Defect because numerous consumer complaints regarding Paint Defect were made directly to Nissan or on online sources monitored by Nissan. The large number of complaints, and the consistency of their descriptions of the Paint Defect alerted, or should have alerted, Nissan that the Paint Defect existed and exclusively affected the Class Vehicles.

111.    The full universe of complaints made directly to Nissan about the Paint Defect is information presently in the exclusive custody and control of Nissan and is not yet available to Plaintiffs prior to discovery. However, as set forth above, many of the Plaintiffs and many Class Vehicle owners complained about the Paint Defect directly to Nissan and its authorized dealerships. Similarly, Nissan's dealers reported to Nissan an increase in the complaints they received about the Paint Defect.

112.    Many of these complaints occurred at the beginning of the relevant timeframe and a time well-before Plaintiffs' Class Vehicle leases and purchases and before Plaintiffs brought this lawsuit.

113.    As the relevant time progressed, Nissan no doubt increasingly received or was aware of complaints made directly to Nissan or its authorized dealers or on websites closely monitored by Nissan. By the time Plaintiffs purchased their Class Vehicles, Nissan received hundreds, if not thousands, of complaints of the Paint Defect affecting the Class Vehicles.

       *iii.*    *The Nelson and Anglin Class Actions*

114.    Nissan also knew or should have known about the Paint Defect because of complaints of substantially similar paint issues impacting Infiniti and Nissan Rogue vehicles, complaints ultimately resulting in the *Nelson* class action being filed against Nissan, which it

30

settled, as alleged above.

115. Despite its various sources of pre-sale knowledge of the Paint Defect, Nissan marketed the Class Vehicles to Plaintiffs at a premium based on their purported durability, high value, and ability to retain value even though it knew that the Paint Defect would severely impact those attributes for the Class Vehicles during their reasonably expected life.

116. Moreover, despite Defendant's knowledge of the Paint Defect before Plaintiffs and the Class members purchased the Class Vehicles and before the defect manifested in Plaintiffs' vehicles, Nissan never disclosed the latent Paint Defect to Plaintiffs or Class Members, despite a duty to do so.

**Nissan Had a Duty to Disclose the Paint Defect Before It Sold Class Vehicles to Plaintiffs and Class Members**

117. From at least the beginning of the relevant time (late 2014 to the present), Nissan had a duty to disclose to consumers, including Plaintiffs, that the Class Vehicles had a latent Paint Defect which caused the white paint on Nissans to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

118. During the relevant time, Nissan possessed exclusive and superior knowledge, not discoverable by Plaintiffs (including through reasonable inspection), regarding the Paint Defect, garnered through internal testing; reports to Nissan of prior substantially similar paint defects; the *Nelson* class action; and widespread consumer reports directly to Nissan and its authorized dealers and online sources closely monitored by Nissan. Therefore, Nissan had a duty to disclose its superior knowledge of the Paint Defect but did not disclose that information. Nissan withheld the information in order to protect its business and bottom line.

119. During the relevant time, Nissan made incomplete and false representations that required a corrective and complete disclosure regarding the Paint Defect, and the sources of pre-

31

sale knowledge that revealed the Paint Defect to Nissan. Among other things, Nissan represented in Product brochures, press releases, and other sources that the Class Vehicles were high-value, stylish, luxurious, and durable, and would retain their value far better than competitor vehicles. However, Nissan failed to disclose that the latent Paint Defect existed and would severely impact the Class Vehicles' value and resale potential, and could result in costly repairs which would very likely fail to resolve the Paint Defect or restore the Class Vehicles to their bargained-for value.

120. Moreover, during the relevant timeframe, Nissan actively concealed consumer reports of the Paint Defect. Nissan knew that if it disclosed that the Class Vehicles suffered from the latent Paint Defect, Plaintiffs and Class members would not have purchased the Class Vehicles or would have paid far less for the Class Vehicles. To selfishly protect its business and financial bottom-line, Nissan concealed the Paint Defect in its sales materials, television advertising, and other promotional channels.

121. Nissan's misrepresentations and omissions were material because, when purchasing cars, Plaintiffs, Class members, and other reasonable consumers were very concerned with vehicle aesthetics, style, luxury, and design; durability and resale value; and the potential need for repairs. Plaintiffs, Class members, and other reasonable consumers would not expect the Paint Defect to arise during the reasonably expected useful life of the Class Vehicles.

122. Moreover, the quality of a vehicle's exterior paint is integral to a vehicle's use and function and safety by preventing rust and corrosion, and as acknowledged by Nissan, a high-quality exterior paint is needed to complement its vehicle design and aesthetics. Therefore, Nissan had a duty to disclose that the Class Vehicles' white paint could prematurely fail, bubble, peel, delaminate, and flake based on the Paint Defect.

**Plaintiffs' Class Vehicle Purchases, Reliance on Nissan's Representations and Omissions, and Attempts to Seek Remedies From Nissan**

32

*Plaintiff John H. Dunbar*

123.    In 2018, Plaintiff John H. Dunbar purchased a 2018 Nissan Frontier in Glacier White with the Paint Defect from an authorized Nissan dealer. At the time Plaintiff purchased the vehicle, the Nissan dealership was in Merritt Island, Florida but it subsequently moved to Cocoa, Florida.

124.    The vehicle was painted Glacier White and showed no outward signs of being defective when Plaintiff purchased it.

125.    Plaintiff Dunbar paid approximately $28,000.00 for the Class Vehicle.

126.    Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

127.    Plaintiff Dunbar relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle. Moreover, the availability of the Nissan in white was a material factor in his decision to purchase the Class Vehicle.

128.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Dunbar and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

33

129.    In April 2022 and July 2023, Plaintiff noticed his Nissan's paint was failing, bubbling, peeling, delaminating and/or flaking, particularly around the driver's door, and then the driver-side rear door.

130.    The following picture shows some of the peeling paint on the vehicle:



131.    Plaintiff contacted the dealership and Nissan to report the peeling paint problem and to request that Nissan repair the Paint Defect. Nissan denied Plaintiff's requests.

132.     When Nissan would not repair the Paint Defect, Plaintiff brought the vehicle to a collision center and received an estimate of $1,200 to repair the peeling spots.

133.     At all relevant times, Plaintiff properly maintained his Class Vehicle. Plaintiff usually keeps his vehicle in his garage.

134.     The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

135.     Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### Plaintiffs Joyce Mills and Natalie Parker

136.     In 2018, Plaintiffs Joyce Mills and Natalie Parker bought a 2018 Nissan Frontier in Glacier White with the Paint Defect.

137.     Plaintiffs Joyce Mills and Natalie Parker bought the vehicle new at an authorized Nissan dealership in Chandler, Arizona.

138.     The vehicle was painted Glacier White and showed no outward signs of being defective.

139.     Plaintiffs Joyce Mills and Natalie Parker paid approximately $27,000.00 for the Class Vehicle. They also paid for an extended warranty (called a Vehicle Protection Plan) for approximately $1,987.00.

140.     Prior to purchasing the Class Vehicle, Plaintiffs Joyce Mills and Natalie Parker viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles,

35

including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

141.    Plaintiffs Joyce Mills and Natalie Parker relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle. Moreover, the availability of the Nissan in white was a material factor in their decision to purchase the Class Vehicle.

142.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiffs Joyce Mills and Natalie Parker and other members of the Class, and as a result, Plaintiffs Joyce Mills and Natalie Parker purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiffs Joyce Mills and Natalie Parker would not have purchased the Class Vehicle, or would not have paid as much for it, had they known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

143.    In or about late 2023 or early 2024, Plaintiffs Joyce Mills and Natalie Parker noticed their Nissan's paint was failing, bubbling, peeling, delaminating and/or flaking.

144.    The following pictures show some of the peeling paint on the vehicle:





Case 3:25-cv-01121    Document 1    Filed 10/01/25    Page 37 of 76 PageID #: 37





145.    Plaintiffs contacted the Nissan dealership in early 2024 to report the peeling paint

and request that Nissan repair it. Nissan responded that it would not fix the car. The car had less

38

than 20,000 miles on t at the time. opened a case number but Nissan later denied the claims, asserting that Plaintiffs had not paid extra for an extended warranty on the paint.

146. Plaintiffs then contacted Nissan's corporate offices in April 2024. In response, Nissan provided a case number (#51162433). Below is an excerpt of a text chain between Plaintiffs and Nissan (through its representative Meghann F) in which Plaintiffs told Nissan about the Paint Defect and requested that Nissan repair the defect:

> Meghann F (4/19/2024, 3:27:42 PM): Hello. Thank you for contacting Nissan Consumer Affairs. How may I assist you today?
>
> Plaintiff Mills (4/19/2024, 3:28:44 PM): I have a Nissan frontier 2018 and the paint is starting to bubble and peel. It appears to not be bonded properly. I am wondering what I can do about this?
>
> Meghann F (4/19/2024, 3:29:07 PM): I'm sorry to hear that the paint is bubbling! I would definitely like to look into this further for you. May I please have your VIN?
>
>                 ***
>
> Meghann F (4/19/2024, 3:32:49 PM): Perfect, thank you so much. Do you know approximately how many miles are on the vehicle?
>                ……
>
> Plaintiff Mills (4/19/2024, 3:33:56 PM): 20,000
> Meghann F (4/19/2024, 3:35:03 PM): Wonderful, thank you. I have documented your concern with the paint bubbling how it is but unfortunately, I am not seeing coverage for this concern. The paint coverage would normally be covered under your Basic Factory warranty and that expired 7/31/2021.
>
> Plaintiff Mills (4/19/2024, 3:36:57 PM): It seems as though this is not common however and I'm wondering if others are having the same issue. A new truck with 20,000 miles should not have paint peeling. If this is the quality of paint for Nissan... I won't be buying another one
>
> Meghann F (4/19/2024, 3:37:30 PM): I absolutely understand where you are coming from and I'm sorry this has been your experience. In terms of a resolution, how would you like Nissan to assist?

Plaintiff Mills (4/19/2024, 3:39:04 PM): It would be great if they can fix the malfunction.... It clearly did not adhere and that's nothing I could see or anticipate when I bought it. It is in 3 places where there is no wear and tear.... Not on roof or hood.

Meghann F (4/19/2024, 3:39:45 PM): I would be happy to request that for you. Have you taken your vehicle to a local Nissan dealership for a diagnosis and repair estimate?

Plaintiff Mills (4/19/2024, 3:40:53 PM): I am happy to do that. I called them initially and they told me that it was not under warranty and they couldn't do anything. So I decided to try Nissan itself
Meghann F (4/19/2024, 3:43:45 PM): Of course, that makes perfect sense. In this case, we would be able to review for assistance once the diagnosis and repair estimate has been completed. Your case number is 51162433 and all you would need to do is call us or chat back in with the results of the diagnostic. While we are unable to guarantee a favorable outcome, since it is reviewed by a different department within Consumer Affairs, it is definitely something we can request and review for you.

Was there anything else I can look into for you today?
Plaintiff Mills (4/19/2024, 3:44:34 PM): Ok will do! Thank you for your time and help
Meghann F (4/19/2024, 3:44:43 PM): You're welcome! I appreciate you taking your time to reach out to Nissan and I hope you have a great day!

147. Plaintiffs then took the vehicle to a Nissan dealership on May 3, 2024 and then to another Nissan dealership on May 26, 2024, but neither Nissan dealership would provide Plaintiffs with an estimate to repair the Paint Defect. Both dealerships referred Plaintiffs to a collision center, which provided an estimate to repair only the peeling spots. Plaintiffs sent that estimate to Nissan's corporate offices, but Nissan said it would not cover the repairs.

148. Nissan then closed the claim and refused Plaintiffs' attempts to repair the vehicle.

149. Plaintiffs then paid $2,234.15 to have the vehicle re-painted.

150. At all relevant times, Plaintiffs properly maintained their Class Vehicle.

151. The paint problem on Plaintiffs' vehicle cannot be the result of any other factor

except the Paint Defect.

152.    Plaintiffs Joyce Mills and Natalie Parker have suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiffs overpaid for their Class Vehicle at the time of purchase, the value of their Class Vehicle has been diminished as a result of the Paint Defect, and they had to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### Plaintiff Paul Menton

153.    In May 2018, Plaintiff Paul Menton purchased a 2018 Nissan Frontier in Glacier White with the Paint Defect from an authorized Nissan dealer in Milford, Massachusetts.

154.    The vehicle was painted Glacier White and showed no outward signs of being defective when Plaintiff purchased it.

155.    Plaintiff Menton paid approximately $31,000.00 for the Class Vehicle.

156.    Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

157.    Plaintiff Menton relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle.  Moreover, the availability of the Nissan in white was a material factor in his decision to purchase the Class Vehicle.

158.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Menton and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the

reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

159.    In 2022 Plaintiff noticed peeling on the driver's side of the vehicle and then in 2024 he noticed peeling on the passenger side of the vehicle. Plaintiff noticed his Nissan's paint was failing, bubbling, peeling, delaminating and/or flaking.

160.    The following pictures show some of the peeling paint on the vehicle:





161.    Plaintiff contacted Nissan directly and spoke to a Nissan representative named Robin. Plaintiff reported the peeling paint and requested that Nissan repair the vehicle, but Nissan said there was no recall and therefore Nissan would not fix the vehicle.

162.    Plaintiff also communicated with the authorized Nissan dealership, including the Nissan dealership in Bourne, Massachusetts, reported the peeling paint, and requested that Nissan repair the vehicle. Plaintiff spoke with a representative named Nick, who took pictures of the peeling paint, agreed that the vehicle was peeling, agreed that it should not be peeling, and said that although the paint will continue to peel, Nissan had not issued a recall and therefore Nissan would not repair the vehicle.

163.    At all relevant times, Plaintiff properly maintained his Class Vehicle.

164.    The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

165.    Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate

result of Nissan's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### Plaintiff Paul Daubel

166.    In 2018, Plaintiff Paul Daubel purchased a 2017 Nissan Frontier in Glacier White with the Paint Defect from an authorized Nissan dealer in Richmond, Kentucky.

167.    The vehicle was painted Glacier White and showed no outward signs of being defective when Plaintiff purchased it.

168.    Plaintiff Daubel paid approximately $24,000.00 for the Class Vehicle. Plaintiff also purchased an extended warranty for the vehicle for $2,497.00.

169.    Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

170.    Plaintiff Daubel relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle.  Moreover, the availability of the Nissan in white was a material factor in his decision to purchase the Class Vehicle.

171.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Daubel and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its

44

value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

172.    In 2023 Plaintiff first noticed peeling on the vehicle. Plaintiff noticed his Nissan's paint was failing, bubbling, peeling, delaminating and/or flaking.

173.    The following pictures show some of the peeling paint on the vehicle:





46



174. In September 2023, Plaintiff contacted Nissan directly, reported the peeling paint and requested that Nissan repair the vehicle, but Nissan said it would not fix the vehicle.

175. Plaintiff also emailed Nissan in September 2023 about the Paint Defect. Nissan responded to confirm that it received the email, but Nissan would not repair the Paint Defect.

176. At all relevant times, Plaintiff properly maintained his Class Vehicle.

177. The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

178. Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and

he will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### Plaintiff Anthony A. Hickerson

179.    In 2021, Plaintiff Anthony Hickerson purchased a new, white 2019 Nissan Murano with the Paint Defect from an authorized Nissan dealer in Bluffton, South Carolina.

180.    The vehicle was painted white and showed no outward signs of being defective when Plaintiff purchased it.

181.    Plaintiff Hickerson paid approximately $44,000.00 for the Class Vehicle.

182.    Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

183.    Plaintiff Hickerson relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle.  Moreover, the availability of the Nissan in white was a material factor in his decision to purchase the Class Vehicle.

184.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Hickerson and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

48

185.   In April 2025 Plaintiff first noticed peeling on the vehicle. Plaintiff noticed one spot and then, over the next few months, the peeling paint started to increase in size and more portions of the vehicle's paint started to bubble, peel, delaminate and/or flake.

186.   The following picture shows some of the peeling paint on the vehicle:







187.    After seeing the peeling paint, Plaintiff's wife contacted Bernard Glover of Vaden Nissan of Hilton Head's service department to report the peeling paint and request that Nissan repair the vehicle. The Nissan representative  acknowledged that he had seen many other white Nissans with peeling paint, and he said that white Nissans had a significant problem with peeling and delaminating paint.

188.    Mr. Glover of Vaden Nissan of Hilton Head  said Nissan would not fix the vehicle.

189.     At all relevant times, Plaintiff properly maintained his Class Vehicle.

190.     The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

191.     Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### *Pamela Winterburn*

192.     In 2017, Plaintiff Pamela Winterburn purchased a new, white 2017 Nissan Frontier SV Crew from an authorized Nissan dealer in Milledgeville, Georgia.  Plaintiff originally bought the vehicle with her daughter but then took over the title and registration of the vehicles in 2021.

193.     The vehicle was painted Glacier White and showed no outward signs of being defective when Plaintiff purchased it.

194.     Plaintiff Winterburn paid approximately $32,000.00 for the Class Vehicle.

195.     Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

196.     Plaintiff Winterburn relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle.  Moreover, the availability of the Nissan in white was a material factor in her decision to purchase the Class

Vehicle.

197.    Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Winterburn and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

198.    In 2023 Plaintiff first noticed peeling on the vehicle. Plaintiff noticed one spot of peeling paint on the passenger side tailgate, another on the top of the passenger side front wheel well, and another on the top of the driver's side wheel well. Over time, the peeling paint has increased in size.

199.    The following picture shows some of the peeling paint on the vehicle:







200.     Plaintiff subsequently learned that many owners of white Nissans were experiencing similar peeling paint problems and that Nissan was not repairing or repainting the vehicles.

201.     The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

202.     Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of

55

purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

### *Plaintiff Claire Ransom*

203. In 2018, Plaintiff Claire Ransom purchased a new, white 2017 Nissan Frontier SV with the Paint Defect from an authorized Nissan dealer (Ron Marhoffer Nissan in Ohio).

204. The vehicle was painted white and showed no outward signs of being defective when Plaintiff purchased it.

205. Plaintiff Ransom paid approximately $25,000.00 for the Class Vehicle.

206. Prior to purchasing the Class Vehicle, Plaintiff viewed marketing materials that touted the quality, durability, and value of Nissan's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Nissan dealership emphasized the quality, durability, and aesthetic features of the Class Vehicle.

207. Plaintiff Ransom relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase the Class Vehicle. Moreover, the availability of the Nissan in white was a material factor in her decision to purchase the Class Vehicle.

208. Nissan failed to disclose the Paint Defect to consumers, including Plaintiff Ransom and other members of the Class, and as a result, Plaintiff purchased the Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value. Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate,

56

and flake off the Class Vehicle.

209.    In Spring 2025 Plaintiff first noticed peeling on the vehicle. Plaintiff noticed one spot and then, over the next few months, the peeling paint started to increase in size and more portions of the vehicle's paint started to bubble, peel, delaminate and/or flake.

210.    The following picture shows some of the peeling paint on the vehicle:



211.    Plaintiff subsequently learned that many owners of white Nissans were experiencing similar peeling paint problems and that Nissan was not repairing or repainting the vehicles.

212.    The paint problem on Plaintiff's vehicle cannot be the result of any other factor except the Paint Defect.

213.    Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Nissan's misconduct in that Plaintiff overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to pay out-of-pocket to repair a latent Paint Defect Nissan was well aware of at the time of sale.

**Plaintiffs and Class Members Suffered Damages Caused by the Paint Defect**

57

214. Plaintiffs and Class members purchased the Class Vehicles based on their reasonable, but mistaken, belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Nissan were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect – the Paint Defect. Had Plaintiffs and Class members known of the Paint Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

215. As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm. This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

216. Plaintiffs and Class members paid premiums to purchase the Class Vehicles because of the brand, quality, durability, and value representations made by Nissan. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

217. As a direct result of Nissan's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs

and Class members paid a premium for the Class Vehicles, which Nissan advertised as being durable and of high-quality, and received Class Vehicles that contained a known but concealed Paint Defect. Nissan was unjustly enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

218.    In addition, the widespread disclosure of the Paint Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

219.    As a result of Nissan's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

**The Class Vehicle's Warranties Were Unconscionable and/or Fraudulent**

220.    Nissan sold the Nissan Class Vehicles with a "New Vehicle Limited Warranty" ("NVLW") which provided coverage for 3 years or 36,000 miles, whichever came first.

221.    The NVLW covers the costs of repair or replacement of original parts that are found to be defective in materials or workmanship. The warranty generally is transferable to subsequent owners of the vehicle.

222.    Nissan's warranties and any extended warranties were unconscionable and fraudulent because:

a.    Nissan leveraged its vastly unequal bargaining power to knowingly sell Class Vehicles with uniform Paint Defects, which caused the Class Vehicles' paint to fail, bubble, peel, delaminate, and flake. Despite its vastly superior position and its exclusive knowledge,

59

Nissan failed to inform Plaintiffs and Class members of the defect and misrepresented the reliability, quality, performance, and qualities of the Class Vehicles. Instead of informing Plaintiffs and the Class of the Products' known Paint Defect that that made the Class Vehicles inevitably susceptible to paint failure bubbling, peeling, delaminating, and flaking, Nissan attempted to limit its warranty and Plaintiffs' warranty and other remedies. The limited remedies Nissan offered unreasonably favor Nissan given its superior and exclusive knowledge regarding the Paint Defect, and contravene the reasonable expectations of Plaintiffs and Class members concerning the performance of the Paint Defect.

b. Nissan knowingly limited the warranties by duration to avoid addressing the vast bulk of Paint Defect claims. Although the latent Paint Defect existed during the Nissan warranties period, Nissan understood the majority of Class Vehicles would not manifest the Paint Defect until after the warranty period;

c. Nissan's warranties include misrepresentations and improper exclusions about the known Paint Defect;

d. Any Nissan extended warranties were improperly and knowingly limited by duration and by limiting the models, years and the particular white paint colors to avoid the bulk of claims. Although the latent Paint Defect in the Class Vehicles existed during the extended warranty period, Nissan understood the vast majority of Class Vehicles would not manifest the Paint Defect until after the Nissan extended warranty period and would manifest in other Class Vehicles, the majority of which were not covered by Nissan's extended warranties, including those that resulted from the *Nelson* class action settlement;

e. Repairs, even when provided pursuant to warranties, did not adequately address and remedy the Paint Defect; and

f. Many impacted Class members have had their claims rejected improperly and arbitrarily by Nissan, even where their Class Vehicles qualified for coverage under the plain terms of the warranties and extended warranties.

223. Repainting the Class Vehicles, even if done properly, does not remedy the Paint Defect and does not remedy the diminution of value that occurs because of the repainting.

224. For all the Class Vehicles, the factory paint was applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Nissan when marketing the Vehicles to customers—whereas the repair process used by Nissan is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

225. Indeed, repainting a Class Vehicle—that has been exposed to environmental elements during its use—using Nissan's repair process could never achieve the same finish that is produced during the original painting of the Vehicle given the equipment and methods used by Nissan in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied. Nissan knew that its repair procedures were inadequate at the time they were first implemented, especially considering the environmental and technical limitations of the body shops it authorized to perform such repairs yet concealed that fact from the Class.

226. Even if the Class Vehicles were properly repainted, their value would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a brand like Nissan, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to

lower the price

227.    In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

228.    According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage.  In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets.  Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting.    If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.[6]

229.    CarMax's vehicle appraisals are determined, among other criteria, by inspecting a "car's condition both inside and out." CarMax notes that "major defects" can impact their offers. CarMax significantly lowers the appraised values for vehicles, including the Class Vehicles, that have been repainted.

---

[6]  CarMax, *Carmax.com "Quick Poll" Finds Consumers Often Misidentify Damage Indicators* (Apr. 28, 2008), http://investors.carmax.com/news-releases/news-releases-details/2008/VIDEO-CarMax-Offers-Tips-to-Spot-Hidden-Vehicle-Damage/default.aspx.

230.     Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle.  KBB divides the condition of used vehicles into the following four grades:

**Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

**Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, ***body and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the paint, body*** and/or interior ***need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

231. According to KBB's online Condition Quiz, vehicles that have extensive paintwork and no paint damage are considered to be, at most, in "Good" condition, while vehicles that have no paintwork and extensive paint damage are considered to be, at most, in "Fair" condition.

**Fraudulent Concealment Allegations**

232. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Nissan responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Nissan necessarily is in possession of, or has access to, all this information,

233. Plaintiffs' claims arise out of Nissan's fraudulent concealment of the Paint Defect and the peeling, delaminating, flaking, and bubbling of the Class Vehicles' paint that the Paint Defect causes. Similarly, Plaintiffs' claims arise out of Nissan's representations about the quality, durability, and value of the Class Vehicles, including the paint used on the Class Vehicles.

234. To the extent that Plaintiffs' claims arise from Nissan's fraudulent concealment, Plaintiffs allege that at all relevant times, including specifically when they purchased their Class Vehicles, Nissan knew, or was reckless in not knowing, of the Paint Defect; Nissan was under a duty to disclose the Paint Defect based upon its exclusive knowledge of it, its affirmative

representations about it, and its concealment of it, and Nissan never disclosed the Paint Defect to Plaintiffs or the public at any time or place or in any manner.

235.    Plaintiffs make the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily available only to Nissan:

236.    _Who:_ Nissan actively concealed the Paint Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles, as alleged above. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Nissan responsible for such decisions.

237.    _What_: Nissan knew, or was reckless in not knowing, that the Class Vehicles contain the Paint Defect, as alleged above.  Nissan concealed the Paint Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as specified above.

238.    _When_: Nissan concealed material information regarding the Paint Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than late 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above.  Nissan has not disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Nissan. Nissan has never taken any action to inform consumers about the true nature of the Paint Defect in Class Vehicles. Moreover, when consumers brought their Class Vehicles to Nissan complaining of the Paint Defect, Nissan denied any knowledge of, or responsibility for, the Paint Defect, and in many instances, actually blamed Class Members for causing the problem.

239.    _Where_: Nissan concealed material information regarding the true nature of the Paint

65

Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Nissan disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Nissan. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Nissan's website.

240. *How*: Nissan concealed the Paint Defect from Plaintiffs and Class Members and made representations about the quality and durability of the Class Vehicles. Nissan actively concealed the truth about the existence and nature of the Paint Defect from Plaintiffs and Class members at all times, even though it knew about the Paint Defect and knew that information about the Paint Defect would be important to a reasonable consumer, and Nissan promised in its marketing materials that the Class Vehicles have qualities that they do not have.

241. *Why*: Nissan actively concealed material information about the Paint Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles. Nissan made representations about the quality and durability of the Class Vehicles to earn additional revenue and to avoid the cost and expenses of stripping and repainting the Class Vehicles. It was cheaper and more lucrative for Nissan to continue selling the Class Vehicles with the Paint Defect than it would have been for Nissan to recall the vehicles and pay to strip and repaint them. Had Nissan disclosed the truth in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

**Tolling of the Statute of Limitations**

66

242.    _Fraudulent Concealment Tolling_: Nissan has known of the Paint Defect in the Class Vehicles since at least late 2012, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Paint Defect, even when directly asked about it by Plaintiffs and Class members during communications with Nissan, Nissan Customer Relations, Nissan dealerships, and Nissan service centers. Nissan continues to conceal the Paint Defect.

243.    Before Plaintiffs purchased their vehicles, Defendant knew it had problems with the peeling paint on the Class Vehicles because of at least the following facts:

a.    People who had purchased white Nissan Rogues that had been manufactured between January 11, 2013 and April 23, 2013 had complained to Nissan that the white paint on their vehicles was prematurely peeling. The process and paint used for those Rogues was the same or similar to the process and paint used on the Class Vehicles; and

b.    People who had purchased white Infinitis manufactured by Nissan between November 20, 2009 and December 12, 2012 had complained to Nissan that the white paint on their vehicles was prematurely peeling. The process and paint used for those Infinitis was the same or similar to the process and paint used on the Class Vehicles;

c.    In 2017, before most of the Plaintiffs bought their Class Vehicles, owners of certain white Nissan Rogues and Infinitis filed class actions against Nissan alleging that the white paint on their cars was prematurely peeling. See the _Nelson_ action. The painting process and paint used for those Rogues and Infinities in the _Nelson_ action was the same or similar to the process and paint used on the Class Vehicles;

d.    Before Plaintiffs bought their Class Vehicles, Nissan and its dealerships were receiving reports from people who bought their cars and were experiencing peeling white paint;

e.    Nissan dealerships were receiving higher-than-normal requests to repair and repaint white Nissans because of the Paint Defect;

f.    Nissan dealerships were contacting Nissan's corporate offices to inform Nissan about claims by owners of Class Vehicles reporting that the white paint on Class Vehicles was peeling prematurely; and

67

g.  Nissan was receiving and denying warranty claims covering Class Vehicles from consumers seeking coverage for the costs of repairing or repainting the white paint on Class Vehicles that was peeling prematurely.

244.  Any applicable statute of limitation has been tolled by Nissan's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

245.  *Estoppel*: Nissan was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  Nissan actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Class Vehicles. Plaintiffs and Class members reasonably relied upon Nissan's knowing and affirmative representations and/or active concealment of these facts.   Based on the foregoing, Nissan is estopped from relying on any statutes of limitation in defense of this action.

246.  *Discovery Rule*: The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Paint Defect.

247.  However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.  Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, and bubbling were caused by a defect in the Class Vehicles because of Nissan's active concealment of the Paint Defect.   Not only did Nissan fail to notify Plaintiffs or Class members about the Paint Defect, Nissan, in fact, denied any knowledge of, or responsibility for, the Paint Defect when directly asked about it, and, in many instances, actually blamed the owner for causing the problem.

248.  Thus, Plaintiffs and Class members were not reasonably able to discover the Paint

Defect until after they had purchased the Class Vehicles and after their Class Vehicle began to peel, despite their exercise of due diligence, and their claims did not accrue until, at earliest, they discovered that the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicles.

## **CLASS ACTION ALLEGATIONS**

249. Plaintiffs seek to represent and certify a class consisting of all persons or entities in the United States that purchased or leased a Class Vehicle. Alternatively, Plaintiffs seek state subclasses of person or entities in the United States that purchased or leased a Class Vehicle.

250. The Class (and any subclass) excludes anyone who was a member of the settlement class in *Nelson* and whose claims were released by the *Nelson* settlement. The Class (and any subclass) also excludes anyone who has had their Class Vehicle totally repainted at Nissan's expense or who has signed a release of claims with Nissan relating to the Paint Defect on their Class Vehicle.

251. The Class (and any subclass) also excludes any judge or magistrate assigned to this case, Nissan, Nissan's officers, directors, legal representatives, successors, and assigns, and any entity in which Nissan has a controlling interest.

252. Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b).

253. *Numerosity*: This proposed class action involves hundreds or thousands of Class Vehicles. Although the exact numbers are unknown to Plaintiffs, the number of individuals in the Class (and any subclass) far exceeds forty (40) individuals and very likely amounts to thousands of individuals. As a result, the Class is so numerous that joinder of all members is impracticable.

254. The proposed class (and any subclass) is defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member.

Individual class members (and any subclass members) can be identified through affidavits and/or reference to documents in Nissan's possession, custody, or control without resort to a mini-hearing on the merits.

255. _Commonality_: The questions of law and fact common to the Class (and any subclass) predominate over any questions which may affect individual members of the Class and include:

      a.  Whether the Class Vehicles suffer from a latent Paint Defect;

      b.  When and how Nissan knew or suspected the Class Vehicles had a latent Paint Defect;

      c.  Whether Nissan adequately disclosed the Paint Defect to Plaintiffs and Class Members (and any subclass members);

      d.  Whether Nissan made false and/or misleading statements and omissions concerning the Class Vehicles and the Paint Defect;

      e.  Whether Nissan's conduct offended public policy without providing any countervailing benefits; and

      f.  Whether Plaintiffs and the Class (and any subclass) are entitled to actual and compensatory damages, restitution, and statutory damages.

256. _Typicality_: Plaintiffs' claims are typical of those belonging to members of the Class (and any subclass). Each Plaintiff purchased or leased a Class Vehicle with the latent Paint Defect and suffered economic damages as a result.

Rule 23(b)(1)

257. _Adequacy_: Plaintiffs will fairly and adequately protect the interests of the Class (and any subclass). Plaintiffs have retained counsel experienced in complex class action litigation,

70

and Plaintiffs and their chosen counsel have no interests adverse to those of the Class (and any subclass).

*Rule 23(b)(1)*

258.    Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Class (or members of any subclass) would create a risk of inconsistent or varying adjudications with respect to individual members of the Class (and any subclass), which would establish incompatible standards of conduct for Nissan.

259.    Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Class (or members of any subclass) would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

*Rule 23(b)(2) – Declaratory Relief*

260.    Rule 23(b)(2) of the Federal Rules of Civil Procedure: Nissan has acted or refused to act on grounds generally applicable to Plaintiffs and Class members (and any subclass members), thereby making appropriate declaratory relief, with respect to the Class as a whole.

*Rule 23(b)(3) – Superiority*

261.    Common questions of law and fact exist as to every member of the Class (and any subclass) and predominate over any questions solely affecting individual members of the Class, including the common questions identified above.

262.    A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the Class (and members of any subclass), though important to them, are relatively small compared

71

to the burden and expense of individual prosecution needed to address Nissan's misconduct. Individualized litigation presents potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the Class Vehicles and were damaged by Nissan's uniform misconduct.

263. Plaintiffs cannot be certain of the form and manner of proposed notice to members of the Class (and any subclass) until the Class is finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail will be given to Class (or subclass) members who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications to reach Class members.

264. Plaintiffs reserve their right to modify or amend the definition of the proposed Class (and any subclass) and to assert additional subclasses at any time before the Court certifies the Class.

## **FIRST CLAIM**

### **Breach of Implied Warranty of Merchantability**

265. Plaintiffs incorporate by reference each prior paragraph of this Complaint.

266. Plaintiffs and the other Class members each contracted with Defendant, through its dealer-agents and its related entities, to purchase Nissan vehicles, and the purchase price paid by Plaintiffs and the Class members constituted substantial consideration for the vehicle.

267. The Nissan vehicles purchased by Plaintiffs and the Class members contained a latent paint defect that existed at the time the vehicles left Defendant's hands.

268. Defendant breached the implied warranty of merchantability that was provided by Defendant to each vehicle owner, as the Nissan vehicles purchased by Plaintiffs and the other Class members were not fit for the ordinary purposes for which they were to be used. Specifically, the paint would not last for the useful life of the vehicle. The purchased vehicles were objectively unreasonable and would not pass inspection as conforming goods within the trade, because at the time of sale they had defective paint that has and/or will fade in color, peel, and delaminate, and will cause rust and corrosion, during the lifetime of the vehicle.

269. The paint defect in the Nissan vehicles is the direct and proximate cause of the damages and losses incurred, and/or to be incurred, by Plaintiffs and the other Class members in an amount to be determined at trial. These damages include, *inter alia*: the decrease in resale value of the vehicles resulting from the Paint Defect, including color fading, peeling/delamination, and increased rust and corrosion; expectation damages as a result of Plaintiffs and the Class members being denied the benefit of the bargain they agreed to with Defendant; and any further monetary or other damages that Plaintiffs and the Class members have incurred and/or will incur in order to effectively remedy their vehicles' paint-related problems.

270. Given the latent nature of the paint defect and Defendant's concealment of the defect, any limitations period that would otherwise bar the claims of Plaintiffs or the other Class members should be tolled. Additionally, Plaintiffs and the Class members continue to suffer a

violation of their legally protected interests each day that Defendant fails to remedy the defect and make them whole.

## SECOND CLAIM

### Unjust Enrichment

271. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

272. Plaintiffs bring this claim on behalf of themselves and the Class they seek to represent.

273. Nissan has received hundreds of millions of dollars in revenue from the sale of the Class Vehicles between late 2014 and the present.

274. This revenue was a benefit conferred upon Nissan by Plaintiffs and Class members, individuals living across the United States.

275. Nissan manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the vehicles' known defects and touting their quality, durability, and high resale value.

276. Nissan benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs and the Class members have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Paint Defect.

277. Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on Nissan's omissions. Nissan knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

278. The Class Vehicles' Paint Defect, and Nissan's concealment of the Paint Defect,

enriched Nissan beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues between late 2014 and the present.

279. Therefore, because Nissan will be unjustly enriched if it is allowed to retain the revenues obtained through its deception and omissions, Plaintiffs and each Class member are entitled to recover the amount by which Nissan was unjustly enriched at his or her expense.

280. Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Nissan in the amounts by which Nissan has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class members, respectfully request that the Court certify the proposed Class, including designating the named Plaintiffs as Class representatives and appointing the undersigned as Class Counsel, and designating any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against Nissan including the following relief:

a) A declaration that any applicable statutes of limitations are tolled due to Nissan's fraudulent concealment and that Nissan is estopped from relying on any statutes of limitations in defense;

b) Restitution, compensatory damages, and costs for economic loss and out-of-pocket costs;

c) Punitive and exemplary damages under applicable law;

d) Reimbursement and compensation of the full purchase price for any replacement paint job purchased by a Plaintiff or Class member;

e) A determination that Nissan is financially responsible for all Class notices and the

administration of Class relief;

f) Any applicable statutory or civil penalties;

g) An order requiring Nissan to pay both pre-judgment and post-judgment interest on any amounts awarded;

h) An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

i) Leave to amend this Class Action Complaint to conform to the evidence produced in discovery and at trial; and

j) Any such other and further relief the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Dated: October 1, 2025      Respectfully submitted,

**HERZFELD, SUETHOLZ, GASTEL, LENISKI AND WALL PLLC**

By: */s/ Joe P. Leniski, Jr.*
Joe P. Leniski, Jr. (TN Bar #22891)
Benjamin A. Gastel (TN Bar #28699)
1920 Adelicia Street, Suite 300
Nashville, Tennessee 37212
Telephone: (615) 800-6225
Email: joey@hsglawgroup.com
Email: ben@hsglawgroup.com

SQUITIERI & FEARON, LLP
Stephen J. Fearon, Jr. (subject to *pro hac vice*)
205 Hudson Street, 7th Floor
New York, New York 10013
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
***Attorneys for Plaintiffs and the Proposed Class***

76